**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

MICHAEL PRICE,

      Plaintiff,

v.                                                                  Case No:  2:11-cv-468-FtM-38DNF

DISTRICT SCHOOL BOARD OF
COLLIER COUNTY, FLORIDA,

      Defendant.

_____/

## ORDER

      This matter comes before the Court on Defendant District School Board of Collier County, Florida's Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. #29) filed on May 15, 2013.  Plaintiff's Memorandum of Law in Opposition to Summary Judgment (Doc. #32) was filed on May 29, 2013.  Defendant's Reply (Doc. #42) was filed on July 1, 2013.  Plaintiff's Sur-Reply (Doc. #45) was filed on July 17, 2013.  Thus, the Motion is now ripe for review.

      On November 14, 2011, Plaintiff Michael Price filed an Amended Complaint (Doc. #8) alleging a single count of age discrimination arising under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 *et seq.*, against Defendant District School Board of Collier County, Florida (the "District").

      Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010).

A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).   The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact.   Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004).   To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, which are sufficient to establish the existence of the essential elements to that party's case, and the elements on which that party will bear the burden of proof at trial.   Celotex Corp. v. Catrett, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party.   Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).   However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment."   St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296-97 (11th Cir. 1983) (finding summary judgment "may be inappropriate where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")).   "If a reasonable fact finder evaluating the evidence could draw

more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007). "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Tullius v. Albright, 240 F.3d 1317, 1320 (11th Cir. 2001) (citing Clemons v. Dougherty Cnty., 684 F.2d 1365, 1369 (11th Cir. 1982)).

### **FACTS**

The Court finds the following undisputed summary judgment facts: In 2001, Plaintiff submitted an application to the District, seeking an open administrative position. (Plaintiff's Dep. Ex. A to Doc. #29, p. 19). Ultimately, the Plaintiff was selected for the position of Dean of Attendance and Discipline at Gulf Coast High School (the "Dean"). Id. at 20. At the time that Plaintiff was hired by the District, he was fifty-eight (58) years old. Id. at 65. Plaintiff was employed pursuant to an annual contract. Id. at 21; Terry Aff., Ex. B to Doc. #29, ¶2(a). An annual contract offers employment to school administrators for the number of work days within the school year, approximately 205 days. (Plaintiff's Dep. at 21). The contract does not guarantee future employment and the non-renewal of an annual contract does not preclude one employee from applying for other positions within the District. In fact, persons who have not been renewed and have applied for administrative positions have received job offers and have filled such positions. (Terry Aff. at ¶2(b)).

Before starting his employment, Plaintiff was required to complete a new hire training course. (Plaintiff Dep. at 26). During the training, the District provides new

employees with a copy of its handbook and explains its policies and procedures, including the policy prohibiting discrimination and harassment.  Id. at 28.

As Dean, Plaintiff reported directly to the Assistant Principal for Attendance and Discipline (the "AP").  Together, the AP and Dean were responsible for ensuring the enforcement of the District student Code of Conduct, as well as school-specific disciplinary policies.  Id. at 21-22, 24.  Plaintiff spent approximately three school years at Gulf Coast High School as a Dean.  Id. at 29-30.  In 2004, he became the AP of Attendance and Discipline at Lely High School ("Lely"), where he was employed upon an annual contract.  Id. at 29-30, 28.  When Plaintiff assumed the AP position, he was sixty-one (61) years old.  Id. at 65.

As AP at Lely, Plaintiff continued to be responsible for the enforcement of the District's student Code of Conduct in school, on the buses, and during extracurricular activities.  Id. at 39, 53, 61.  One of the primary differences between the AP and Dean positions, however, was that as an AP, Plaintiff had a staff of people to supervise.  Id.  As an AP, Plaintiff supervised the Dean, as well as a clerk and secretary for attendance and discipline.  Id. at 38-39, 41-42.  Plaintiff also worked closely with two Youth Relations Deputies ("YRDs") assigned to Lely.  YRDs are employees of the Collier County Sheriff's Office who are assigned to District schools to ensure security, assist with legal compliance, and react to and even arrest students if they observe or learn of any laws being broken.  Id. at 43.  Specific deputies were assigned to Lely, and were generally present during school hours.  Id. at 44.

Student disciplinary issues were generally brought to the attention of the AP by the YRDs or the AP's staff, or by teachers or bus drivers completing disciplinary referral

forms.  Id. at 51-52.   Referral forms were provided to the staff in triplicate.   Once the AP's office followed up with a student, the teacher was to receive a copy of the action taken, and a copy was to be put in the student's file.  Id. at 55.

During Plaintiff's first two years at Lely, he reported to three different principals, including Mike Parrish.  Id. at 63-64.  Mr. Parrish, who was absent for much of the 2005-2006 school year, nonetheless completed a performance evaluation for Plaintiff.  Id. at 67, 73.  In the section of the evaluation entitled "Areas for Growth," Mr. Parrish asked Plaintiff to "increase the amount of parent contact through various means, ie direct phone calls, phone dialer, ESembler, cards, etc., in order to minimize discipline problems" and to "[b]egin a group session with teachers to discuss how to differently handle behavior problems."  Id., Ex. 2.  When asked at his deposition if he completed the tasks listed by Mr. Parrish on his evaluation form, Plaintiff indicated that he already used the listed programs to contact parents, and that he never did start a group session for teachers to discuss how best to handle behavior problems.  Id. at 73.

In May 2006, it was announced that Mr. Parrish would not be returning to Lely.  Id. at 74.  Plaintiff was interested in being promoted to Principal, and submitted an application for the position.  Id., Ex. 3.  He was not, however, selected to interview for the position because he lacked sufficient experience as a principal to satisfy the eligibility for the position.  Id. at 77-78.  Plaintiff testified at his deposition that he was disappointed that he was not selected for the position.  Id. at 84.  He testified that he never undertook any type of training to better qualify himself for a principal position.  Id. For example, Plaintiff knew that, in order to become a principal within the District, he was required to complete the Administrator's Academy (the "Academy").  Id. at 32.

Although Plaintiff initially attended three Academy sessions when he first started with the District, he never completed it. Id. at 33. When asked why he did not complete the Academy, the Plaintiff testified that "[i]t was kind of repetition of what everyone has been through, if they have been a principal at any other district" and that he got "very little" out of it. Id. at 33-34, 37. After Plaintiff was denied the Principal position at Lely, he made no attempt to complete the Academy. Id. at 85. When asked why he never completed it, Plaintiff stated that "it was useless for [him] to do anything else" to try to advance to a principal's position, and that he "just wanted to work a couple, three years. And, with administration swinging to Dr. Thompson, I was content to be where I was for a year or so, two or three years." Id. at 84-85

Kenneth Fairbanks was selected by the District to assume the position of Principal at Lely during the 2006-07 school years. Id. at 78. At the time that Mr. Fairbanks was hired as the Principal, he was approximately fifty-seven (57) years old. Id. at 80. Plaintiff now reported directly to Mr. Fairbanks as the new Principal. When Mr. Fairbanks began at Lely, one of his initial priorities was to improve attendance, which fell within Plaintiff's scope of responsibilities. Id. at 94-95. Mr. Fairbanks, like Mr. Parrish, requested Plaintiff to call home more, and increase his level of parent contact. Id. at 95. Mr. Fairbanks also expressed his concern to Plaintiff that one of the YRDs was too verbally and physically aggressive with students. Id. at 97-98. Plaintiff, however, did not think that the YRD's behavior was a problem, testifying "Did it really bother me? Did I ever see him arrest somebody when they were not guilty? No." Id. at 99. Plaintiff talked to the YRD about Mr. Fairbanks' concern but acknowledged that the YRD's behavior did not change. Id. at 98.

Plaintiff and Mr. Fairbanks also discussed, during their first year of working together, why certain disciplinary offenses were occurring, and what steps could be taken to prevent them.  Id. at 99-100.  Mr. Fairbanks suggested that, to prevent certain disciplinary issues, Plaintiff and his staff should "be more active, see more out on the campus, [and] try to get involved earlier."  Id. at 100.  At the conclusion of the 2006-07 school year, Mr. Fairbanks provided Plaintiff with a performance evaluation.  Id. at 108, Ex. 7.  In the section entitled "Areas for Growth," Plaintiff was tasked with developing a new "tardy policy that staff will embrace and follow."  Id. at 108-09.

Plaintiff was offered an annual contract to continue in the AP position at Lely for the 2007-08 school year.  Id. at 114.  During this time, Lely purchased an ID card program which enabled the school to provide ID cards to students as a means of tracking attendance and ensuring that only authorized individuals were permitted on campus.  Id. at 116-17.  Plaintiff believed the program was a "waste of time."  Id. at 116. Plaintiff testified that the process of making the ID cards would be "time consuming," and that students would be "resentful" for having to wear them, and that consistent enforcement would be a problem.  Id.  Plaintiff was responsible for implementing the program.  Id. at 118.  Plaintiff testified that he thought the ID program did not work and Lely ultimately stopped using the program.  Id. at 119-24.

Mr. Fairbanks also addressed issues of student tardiness during the 2007-08 school year with Plaintiff.  Id. at 124.  Plaintiff testified that he may have "tweaked" the existing policy a little bit by possibly changing the number of warnings necessary to obtain certain consequences.  Id. at 125-26.  Plaintiff acknowledged that he and Mr. Fairbanks also had numerous conversations about changing and enforcing the dress

code, testifying that Lely "always had a dress code issue." Id. at 131.  Mr. Fairbanks delegated to Plaintiff the responsibility of drafting and implementing a new dress code. Plaintiff never drafted a new dress code policy during the 2007-08 school year.  Id. at 132.

Mr. Fairbanks also directed the Plaintiff to review the District's Lock Down and Drill Policy, and make sure that Lely had an up-to-date and workable policy.  Id. at 138. The Lock Down and Drill Policy sought to ensure the safety and security of students and staff in the event of any emergency, such as the presence of an intruder.  Id. at 137. Plaintiff did not suggest any changes to the policy because he thought it was functional the way it was.  Id. at 137-39, 148.

In 2007-08, Mr. Fairbanks completed an evaluation of Plaintiff's performance.  In his second year of working for Mr. Fairbanks, Plaintiff's ratings in three separate categories dropped from a "1" to a "2."  Id. at 151-54.  Plaintiff received a "1" rating in six (6) areas and a "2" rating in three (3) areas.  Fairbanks Dep. at 32: 9-15; Ex. C., "Assistant Principal/Dean Performance Appraisal Instrument."  According to the form, "1" is the highest rating and stands for "Performance in this area surpasses expectations." "2," the second highest, denotes, "Performance in this area meets expectations."  For example, Plaintiff received the highest score in "Creates an educationally effective school climate." Id. Under the "Management/Administration Performance" portion of the evaluation, Plaintiff received a "yes" in the fifteen (15) areas in which he was judged, without any "nos."  Id. A "yes" means performance meets acceptable expectations and a "no" means performance does not meet expectations in that area.  Id.  In the "Areas for Growth" section, Mr. Fairbanks wrote the following

comments: "Next year (08-09) we will have a new Assistant Principal for Curriculum as well as a .5 Dean for Attendance and Discipline.  I will need for Mike to 'step up' to take on new leadership roles while we are in transition.   Working with the discipline committee, I want him to explore a uniform dress code policy for students, and a more active role in freshman attendance for their success . . . ." Id. at 155-65.  Plaintiff was expected to complete these goals by April 2009.  Id. at 165.

During the 2008-09 school year, instead of a full-time Dean of attendance and discipline, budgetary pressures dictated that Lely had to split a Dean with Golden Gate High School.  Id. at 140-41.  Lely's part-time Dean was to report directly to Plaintiff, and was to split days between the two schools.  Id. at 161, 169.

Meghan Leiti was hired by the District to fill the part-time Dean position at Lely. Id. at 168-69.   Ms. Leiti received her bachelor's degree in Elementary Education in 1996.  Leiti Dep., Ex. C to Doc. #29, at 9.  In 1998, Ms. Leiti was hired to serve as a drop-out prevention teacher at Golden Terrace Elementary School, a position that she held for two years.  Leiti Aff., Ex. D, ¶4(b).  In 2000, Ms. Leiti became a teacher in the Department of Juvenile Justice's Alternative School Program, where she served until 2004, when she briefly relocated to North Carolina.  Id. at ¶¶4(a) & 5.  Ms. Leiti also earned her Master's Degree in Educational Leadership from Nova Southeastern University. Id. at ¶6(c).

When Ms. Leiti returned to Florida in 2006, she was hired by the District as the Lead Teacher at the Teenage Parenting Program for the District's Alternative School, which was housed at Golden Gate High School.  Id. at ¶6(a).  Ms. Leiti served for an

additional two years as Lead Teacher before assuming the part-time Dean position at Lely.

As a part-time Dean, Ms. Leiti received her assignments directly from Plaintiff. Plaintiff Dep. at 169.   This meant that Plaintiff would provide her with specific disciplinary referrals, and Ms. Leiti would take care of her assigned referrals.  Id. at 170. Plaintiff testified that he did not have any concerns with Ms. Leiti's performance during the 2008-09 school year, and that she did everything that she was asked to do.  Id. at 173.   On the issue of referrals, Plaintiff testified that student disciplinary referrals may have been "shuffled to the bottom of the pile" on occasion, and that he did dispose of certain referrals that he did not believe warranted follow-up.  Id. at 179.  If he deemed a referral unimportant, he would throw it away.  Id. at 180.  Ms. Leiti witnessed Plaintiff throwing away student disciplinary referrals without notifying the teachers of his actions. Leiti Aff. at ¶9.

Ms. Leiti was also present when Mr. Fairbanks raised the issues of the implementation of the student ID badges, student passes, and a new tardiness policy at administrative meetings.  Id. at ¶8(a).  Although Plaintiff would respond positively at the meetings, he informed Ms. Leiti privately that he felt as though the work that Mr. Fairbanks was asking him to perform was a waste of time, and was something that he did not believe in.  Id. at ¶8(b).  Ultimately, Ms. Leiti reported these issues regarding Plaintiff's behavior to Mr. Fairbanks.  Id. at ¶10.

During administrative meetings, Ms. Kutz, the AP of Curriculum and Instruction at Lely, raised concerns about student attendance.  Plaintiff Dep. at 173 & Kutz Aff., Ex. E to Doc. #29 at ¶2 & 3(b).  Ms. Kutz was responsible for determining why students were

receiving failing grades in certain classes.  Plaintiff Dep. at 176 & Kutz Aff. at ¶3(a) & (b).  On multiple occasions during the 2008-09 school year, Ms. Kutz discovered from teachers that a student received a failing grade because he or she was not in class.  Id.  This prompted Ms. Kutz to run her own attendance report, and she learned that there were students with more than 10 consecutive unvalidated absences still on the school rolls that had not been dropped, referred to truancy court, or sent a letter.  Id. at ¶3(b).  Plaintiff testified that this was because telephone numbers in the auto dialer were not reliable.  Plaintiff Dep. at 176.

In March 2009, Plaintiff became interested in serving as the AP at the Alternative School.  Id. at 186.  Rather than having Mr. Fairbanks hear the news from another school principal, Plaintiff went to inform him personally on March 13, 2009.  Id.  Mr. Fairbanks responded by letting Plaintiff know that they might have someone else in mind for the Alternative School position, but he thanked Plaintiff for letting him know of the inquiry.  Id. at 187.  Plaintiff testified at his deposition that he was looking for a new position because he believed that the staff members at Lely had lost their unity, and he "felt maybe someone else could maybe do a better job" as AP at Lely.  Id. at 186-87.

Plaintiff then contacted the Principal at the Alternative School and learned that they did have someone else in mind for the position.  Id. at 188.  Later that afternoon, Mr. Fairbanks sent Plaintiff an e-mail stating that he wanted to talk to him about his interest in other AP positions.  Id. at 189.  Plaintiff proceeded to Mr. Fairbanks' office, and told Mr. Fairbanks that the Alternative School did have someone else in mind for the position, so they "didn't have to worry" about any further discussions relating to him leaving the AP position at Lely.  Id.

Mr. Fairbanks proceeded with the discussion, telling Plaintiff that he had concerns about his performance, and was going to inform the Superintendent of his concerns. Fairbanks Dep, Ex. F to Doc. #29 at 51, Plaintiff Dep. at 189. Mr. Fairbanks testified that the reason he gave was that he was not happy with the job that Plaintiff was doing. Fairbanks Dep. at 51, 61. Mr. Price testified that he was told the reason that he may not be recommended for renewal was because Dr. Thompson – the District superintendent – wanted individuals in the position that wanted to be principals and because Mr. Fairbanks was not really happy with the job Plaintiff was doing. Plaintiff Dep. at 189. Plaintiff at that time had not taken any steps to further his goal of becoming a principal. Id. at 85.

Plaintiff testified that at the meeting Mr. Fairbanks gave him the ultimatum that if he did not resign or retire he would be non-renewed. Plaintiff Dep. at 189, 200; Plaintiff Aff. at ¶1 (Doc. #37). Mr. Fairbanks testified that when he told Plaintiff of the concerns he was going to approach the superintendent with, he was told that he did not need to because Plaintiff was going to resign. Fairbanks Dep. at 51. At that time, Mr. Fairbanks had not yet made the recommendation of non-renewal. Id. Mr. Fairbanks testified that "[e]ven halfway into it, I believe he said, you know, 'Don't worry, I'm going to resign,' you know? There was never any hard feeling or anything." Id. at 61. Plaintiff disputes this, testifying at his deposition that he did not indicate at the meeting with Mr. Fairbanks that he wanted to resign or retire. Plaintiff Dep. at 191. He felt like he did not have a choice. Id. at 198. Plaintiff testified that he did not make any comments like if he was not the man for the job that he would just leave or just retire. Id. at 191. Plaintiff did testify that he said that "if I'm not the man for the job, I'll find another position." Id. at 191. Plaintiff

further testified that he was told by Mr. Fairbanks that after Mr. Fairbanks received Plaintiff's resignation letter he would give him a good recommendation or evaluation. Id. at 196.[1]  Mr. Fairbanks told Plaintiff he would have a week to submit his resignation. Id. at 190.

Plaintiff testified that he was shocked, and that he made some type of comment such as he was sorry that "it didn't work out." Id. at 189-90.  Plaintiff testified that he then asked Mr. Fairbanks whether, if he opted to resign or retire, he would get a good recommendation, and Mr. Fairbanks indicated that he would. Id. at 190.  Plaintiff did not want to be non-renewed because it was his belief that if he was non-renewed he would not be able to obtain another position within the District. Id. at 192-93.  Ultimately, he did not apply for any other positions within the District. Id. at 197.

Plaintiff testified that he completed and signed a resignation because he did not want to be non-renewed. Id. at 191-92.  On March 20, 2009 – 7 days after the meeting with Mr. Fairbanks – Plaintiff completed a "Separation Form-Voluntary," indicating that he would be resigning from his employment effective June 10, 2009. Id. at 201, Ex. 11. He was 62-years old at this time.  Price Affidavit, Doc. #37, ¶3.  Plaintiff indicated on the voluntary resignation form that he was resigning due to "other employment," "family/personal reasons," and "retirement," and that he did not wish to continue working for the District as a substitute. Id. at 203-04.  Plaintiff testified that because he was forced to sign the form to resign he was no longer interested in working for the District. Id. at 202.  After signing the form, Plaintiff continued to work at Lely as the AP of

---

[1] The record further indicates that Plaintiff discussed the differing stories as to what occurred during the meeting with his former colleague, Mickey LaBute.  Plaintiff Dep. at 210-11.

Attendance and Discipline until the last day of his contract, June 10, 2009, nearly three months after the signed the Separation Form.  Id. at 204-05.

Even though Plaintiff had completed the Separation Form, he received a performance evaluation after he had signed the Form for the 2008-09 school year.  Id. at 206.  Plaintiff testified he asked Mr. Fairbanks if he resigned would he get a good evaluation and good letter of recommendation and Mr. Fairbanks said yes.  Id.  In the majority of categories, Mr. Fairbanks rated Plaintiff "consistently demonstrates high performance."  Id. at 209.  Mr. Fairbanks testified that the evaluation was completed after Plaintiff had resigned with an eye towards helping Plaintiff's future career as well as basing it on his performance, and when asked if the 2008-09 evaluation was based solely on Plaintiff's performance, Mr. Fairbanks answered "no."  Fairbanks Dep. at 53, 60.  In all, the performance evaluation was a good one as Plaintiff received from Mr. Fairbanks no rating lower than a Level 3 and was rated "consistently demonstrating high performance in several categories."  Id. at 45-46.  In the "Managing the Learning Environment" category, which includes providing a safe school environment, Mr. Price received a 3, indicating consistent high performance.  Id. at 47.

At the end of the year luncheon, Plaintiff was recognized for his contributions to the school by Mr. Fairbanks.  Plaintiff Dep. at 209.  Plaintiff never complained to anyone at the District that he felt as though he had been discriminated against on the basis of his age prior to leaving the District.  Id. at 211.  He never made any complaint to anyone in human resources that he felt as though he may have been discriminated against.  Id.

Plaintiff also received a letter of recommendation from Mr. Fairbanks dated April 15, 2009.  Fairbanks Dep. at 62, Ex. E.  Mr. Fairbanks called him an asset, praised him

for fostering an extremely safe and secure environment.  He was described as having many positive attributes, such as being hard working and a team player.  Mr. Fairbanks testified that he did not want to ruin Plaintiff's chances for future employment in completing the letter.  Id. at 59.

Under questioning, Mr. Fairbanks confirmed his interrogatory response given in this case that Mr. Fairbanks, as early as the 2006-07 school year had conversations with Mr. Price regarding his failure "to follow-up in a timely manner of student tardiness issues, disciplinary complaints, and the resolution of student disciplinary issues with which he was confronted."  Id. at 15, Ex. A.  When asked if the issue of Mr. Price having purported problems with the student tardiness issue was ever reduced to writing in any form, Mr. Fairbanks answered in the negative.  Id. at 15-16.  Mr. Fairbanks could not recall any of the specific disciplinary complaints and did not document any of the disciplinary complaints.  Id. at 16.  Mr. Fairbanks did not send any written communication to Mr. Price about the issue.  Id. at 17.  Mr. Fairbanks further stated in his interrogatory responses that he criticized Mr. Price about increasing reliance on the school's YRD.  Id. at 17.  Mr. Fairbanks never put anything in writing on that subject.  Id. at 17, 23-25.  He also stated in his interrogatory responses that he had concern with Mr. Price's uniform dress code policy, as well as a lock-down and drill policy.  Id. at 9-16.  These concerns were never memorialized in writing.  Id. at 17-19.  There were purported concerns about Mr. Price regarding excessive student absences, notification of student altercations (even though Mr. Fairbanks could not remember specific examples), dress code policies, and invalidated absences not being referred to truancy court, but nothing was reduced to writing.  Id. at 18-25.  In fact, Mr. Fairbanks testified he did not

document the failings on the part of Mr. Price in any way, shape, or form.  Id. at 21. He testified that he should not have to write someone up or send documents to administrative peers. Id. at 23.  Looking back now, Mr. Fairbanks acknowledges that he should have put his findings in writing.  Id. at 24.  He also testified that he never wrote a reprimand with respect to Mr. Price.  Id. at 18-25.

The District chose Megan Leiti, age 35 at the time, as Plaintiff's replacement. Leiti Dep. at 6.  Ms. Leiti had about ten (10) years of teaching experience as of 2009, but was classified as an administrator for only two (2) years of the ten.  Id. at 32-33. The salary in her new position was $73,528.29, Leiti Dep. at 30, Ex. A.  By contrast, Mr. Price estimated he made $68,000 per year when he left Lely.  Plaintiff Dep. at 237.

Finally, Plaintiff testified that Mr. Fairbanks referred to Plaintiff as an "old man." Id. at 213-14.  He stated that on occasion, Mr. Fairbanks would drop through the outer office, and say "Hey, old man."  Id. at 214.  Mr. Fairbanks stated at his deposition that he does not remember referring to Plaintiff as an "old man" but said that he has an English background and that he might have sometimes said "what's going on ole boy" to Plaintiff.  Fairbanks Dep. at 62.

## DISCUSSION

The ADEA prohibits an employer from discriminating against an employee who is at least 40 years old on the basis of age.  29 U.S.C. §§ 623(a)(1), 631(a).  "In proving an age discrimination claim, a plaintiff can establish a *prima facie* case of discrimination through either direct evidence of discrimination or a variation of the four-part test outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) for circumstantial evidence."  Damon v. Fleming Supermarkets of Florida,

Inc., 196 F.3d 1354, 1358 (11th Cir. 1999); Van Voorhis v. Hillsborough County Bd. of County Comm'rs, 512 F.3d 1296, 1300 (11th Cir. 2008).

I.      **Direct Evidence of Discrimination**

Direct evidence is "evidence that reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" Id. (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004)). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age ... constitute direct evidence of age discrimination." Id. (quoting Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989)) (alteration in original). "[S]tray remarks that are "isolated and unrelated to the challenged employment decision" are insufficient to establish pretext. Ritchie v. Industrial Steel, Inc., 426 F. App'x 867, 873 (11th Cir. 2011) (citing Rojas v. Florida, 285 F.3d 1339, 1342-43 (11th Cir. 2002)). Discriminatory remarks do not constitute direct evidence if they were not related to the challenged employment action or were not made by the decision maker. Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

In this case, the record shows that Plaintiff testified that Mr. Fairbanks referred to Plaintiff as an "old man." Plaintiff Dep. at 213-14. He stated that on occasion, Mr. Fairbanks would drop through the outer office, and say "hey, old man." Id. at 214. Mr. Fairbanks stated at his deposition that he does not remember referring to Plaintiff as an "old man" but said that he has an English background and that he might have sometimes said "what's going on ole boy" to Plaintiff. Fairbanks Dep. at 62. Plaintiff did mention this in his Brief, but stated that he does not rely on the "old man" comments as case dispositive, but urges that they be considered along with other inferences of

discriminatory motive in this case.  There is no indication that Mr. Fairbank's comments were connected to the decision to terminate him and from what the record shows, do not reflect a "discriminatory or retaliatory attitude correlating to the discrimination" nor do they seem to be "the most blatant remarks."  See Van Voorhis, 512 F.3d at 1300.  Thus, Plaintiff has not presented direct evidence of age discrimination and therefore the Court will evaluate Plaintiff's age discrimination claim based on circumstantial evidence.

## II.   Circumstantial Evidence of Discrimination

In evaluating age discrimination claims based on circumstantial evidence, the Eleventh Circuit requires a plaintiff to initially satisfy a four-part *prima facie* test: (1) that he was a member of a protected group of persons between the ages of forty and seventy; (2) that he was subject to adverse employment action; (3) that a substantially younger person filled the position that he sought or from which he was discharged; and (4) that he was qualified to do the job for which he was rejected.  See Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (citations omitted).  To show age discrimination, the plaintiff must prove that age was the "but-for" cause of the challenged decision.  Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78, 129 S. Ct. 2343, 2351, 174 L. Ed. 2d 119 (2009); Sims v. MVM, Inc., 704 F.3d 1327, 1332 (11th Cir. 2013).  If a plaintiff establishes a *prima facie* case of age discrimination, the burden of production then shifts to the employer to offer a legitimate, nondiscriminatory reason for the challenged employment action.  Id.  "However, the employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'"  Id. (quoting Combs v.

Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (citations omitted)).  "If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'"  Id. (quoting Combs, 106  F.3d at 1528).  "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs."  Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010).  "When an employer asserts that it fired the plaintiff for poor performance, it is not enough for the plaintiff to show that his performance was satisfactory."  Ritchie, 426 F. App'x at 872 (citing Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010)).  Rather, he must demonstrate that the employer did not believe that his performance was lacking, and merely used that claim "as cover for discriminating against [him] on account of [his age]."  Id.  The employer is entitled to summary judgment on the plaintiff's claim "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual."  Id. at 1025.

In this case, Defendant argues that Plaintiff cannot satisfy the second and fourth elements of the *prima facie* case because he voluntarily resigned his employment with the District, and his performance, especially during his final year of employment, called into question whether he was qualified to continue as the AP at Lely.  Specifically with regard to the second element, Defendant argues that Plaintiff voluntarily resigned from his employment, and a decision by an employee to voluntarily resign will not constitute

an adverse employment action unless the employee establishes that he was constructively discharged.  Citing <u>Hipp v. Liberty Nat'l Life Ins. Co.</u>, 252 F.3d 1208, 1231 (11th Cir. 2001).  Plaintiff responds that he was given the ultimatum of resign or retire or be non-renewed; he did not have a choice, and argues that job-related ultimatums are treated as adverse employment actions.

The evidence offered at summary judgment in this case regarding whether Plaintiff was subject to an adverse employment action is as follows: In March 2009, Plaintiff became interested in serving as the AP at the Alternative School.  Plaintiff Dep. at 186.  Rather than having Mr. Fairbanks hear the news from anther school principal, Plaintiff went to inform him personally on March 13, 2009.  <u>Id.</u>  Mr. Fairbanks responded by letting Plaintiff know that they might have someone else in mind for the Alternative School position, but he thanked Plaintiff for letting him know of the inquiry.  <u>Id.</u> at 187. Plaintiff testified at his deposition that he was looking for a new position because he believed that the staff members at Lely had lost their unity, and he "felt maybe someone else could maybe do a better job" as AP at Lely.  <u>Id.</u> at 186-87.

Plaintiff then contacted the Principal at the Alternative School and learned that he did have someone else in mind for the position.  <u>Id.</u> at 188.  Later that afternoon, Mr. Fairbanks sent Plaintiff an e-mail stating that he wanted to talk to him about his interest in other AP positions.  <u>Id.</u> at 189.  Plaintiff proceeded to Mr. Fairbanks' office, and told Mr. Fairbanks that the Alternative School did have someone else in mind for the position, so they "didn't have to worry" about any further discussions relating to him leaving the AP position at Lely.  <u>Id.</u>

Mr. Fairbanks proceeded with the discussion, telling Plaintiff that he had concerns about his performance, and was going to inform the Superintendent of his concerns. Fairbanks Dep. Ex. F to Doc. #29 at 51, Plaintiff Dep. at 189. Mr. Fairbanks testified that the reason he gave was that he was not happy with the job that Plaintiff was doing. Fairbanks Dep. at 51, 61. Mr. Price testified that he was told the reason that he may not be recommended for renewal was because Dr. Thompson – the District Superintendent – wanted individuals in the position that wanted to be principals and because he was not really happy with the job Plaintiff was doing. Plaintiff Dep. at 189. Plaintiff at that time had not taken any steps to further his goal of becoming a principal. Id. at 85.

Plaintiff testified that at the meeting Mr. Fairbanks gave him the ultimatum that if he did not resign or retire he would be non-renewed. Plaintiff Dep. at 189, 200; Plaintiff Aff. at ¶1 (Doc. #37). Mr. Fairbanks testified that when he told Plaintiff of the concerns he was going to approach the superintendent with, he was told that he did not need to because Plaintiff was going to resign. Fairbanks Dep. at 51. At that time, Mr. Fairbanks had not yet made the recommendation of non-renewal.[2] Id. Mr. Fairbanks testified that "[e]ven halfway into it, I believe he said, you know, 'Don't worry, I'm going to resign,' you know? There was never any hard feeling or anything." Id. at 61. Plaintiff disputes this, testifying at his deposition that he did not indicate at the meeting with Mr. Fairbanks that he wanted to resign or retire. Plaintiff Dep. at 191. He felt like he did not have a choice. Id. at 198. Plaintiff testified that he did not make any comments like if he was not the

---

[2] Plaintiff testified that these recommendations were usually made to the superintendent in May. Plaintiff Dep. at 193-94.

man for the job that he would just leave or just retire.  Id.   Plaintiff did testify that he said that "if I'm not the man for the job, I'll find another position."  Id. at 191.  Plaintiff further testified that he was told by Mr. Fairbanks that after Mr. Fairbanks received Plaintiff's resignation letter he would give him a good recommendation or evaluation.  Id. at 190, 196.[3]

Plaintiff testified that he was shocked, and that he made some type of comment such as he was sorry that "it didn't work out."  Id. at 190.  Plaintiff did not want to be non-renewed because it was his belief that if he was non-renewed he would not be able to obtain another position within the District.  Id. at 192-93.  He did not apply for any other positions within the District.  Id. at 197.

On March 20, 2009, Plaintiff completed a "Separation Form-Voluntary," indicating that he would be resigning from his employment effective June 10, 2009.  Id. at 201, Ex. 11.  He was 62 years old at this time.  Price Affidavit, Doc. #37, ¶3.  Plaintiff indicated on the voluntary resignation form that he was resigning due to "other employment," "family/personal reasons," and "retirement," and that he did not wish to continue working for the District as a substitute.  Id. at 203-04.  Plaintiff testified that because he was forced to sign the form to resign he was no longer interested in working for the District. Id. at 202.  After signing the form, Plaintiff continued to work at Lely as the AP of Attendance and Discipline until the last day of his contract, June 10, 2009.  Id. at 204-05.

Even though the District argues that Plaintiff cannot satisfy his initial burden of establishing a *prima facie* case because he voluntarily resigned, the focus of the

---

[3] The record further indicates that Plaintiff discussed the differing stories as to what occurred during the meeting with his former colleague, Mickey LaBute.  Plaintiff Dep. at 210-11.

analysis is not on the actual words used, but the circumstances surrounding Plaintiff's departure from the District, to determine whether he was terminated or chose to leave the District.  Plaintiff and Mr. Fairbanks clearly have differing stories as to what occurred at the March 13, 2009 meeting.  Plaintiff testified that Mr. Fairbanks gave him the ultimatum that if he did not resign or retire that he would be non-renewed.  Plaintiff Dep. at 189, 200; Plaintiff Aff. at ¶1 (Doc. #37).  A non-renewal, to him, meant that he would never be hired again in the District, effectively foreclosing any hope of future employment with the District.  Id. at 192-93.  Mr. Fairbanks testified that when he told Plaintiff of the concerns he was going to approach the superintendent with, he was told that he did not need to because Plaintiff was going to resign.  Fairbanks Dep. at 51.  Mr. Fairbanks testified that "[e]ven halfway into it, I believe he said, you know, 'Don't worry, I'm going to resign,' you know?  There was never any hard feeling or anything."  Id. at 61.  Thus, "after a thorough review of the record and the briefs, [the Court] finds that reasonable minds might differ as to whether [Mr. Price] was actually terminated in this case."  Thomas, 116 F.3d at 1435.  This Court "must avoid weighing conflicting evidence or making credibility determinations.  Rather, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  Damon, 196 F.3d at 1362 (quoting Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 918 (11th Cir. 1993) (internal quotations and citations omitted)).

Therefore, summary judgment is denied as the Court finds that there is a genuine issue of material fact as to whether Plaintiff was subject to an adverse employment action pursuant to a *prima facie* case of age discrimination.  Because the Court finds

this case so triable, the Court need not discuss the burden-shifting framework as set forth in <u>McDonnell Douglas</u>.

Accordingly, it is now

**ORDERED:**

Defendant District School Board of Collier County, Florida's Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. #29) is **DENIED.**

**DONE** and **ORDERED** in Fort Myers, Florida this  22nd day of July, 2013.

*Sheri Polster Chappell*

**SHERI POLSTER CHAPPELL**
**UNITED STATES DISTRICT JUDGE**

Copies:  All Parties of Record